Good morning, Your Honor. I'd like to introduce myself. I'm Duncan James. I'd like to give you a little background of who I am because I think it might be helpful as to some of my comments. I was a prosecutor for 12 years. I was District Attorney of Mendocino County for 10 of those years where I served also as a County Counsel. I had the honor and privilege to serve with the Honorable Lowell Jensen when he was District Attorney of Alameda County. We were both founders, co-founders of the California District Attorney's Association, which I had the honor of being President of in 1977-1978. In my career, I have successfully argued a Richardson v. Ramirez, which is a 418 U.S. 24, reversing a unanimous California Supreme Court decision. Since 1979, I have been a criminal defense attorney and civil litigator. During that period of time, I have tried numerous cases, including arson cases on both sides. As a prosecutor, I've convicted. As a defense attorney, my clients have been found not guilty. Ten years ago today, I was in a civil bad faith insurance case in which I was representing plaintiff against an insurance company who declared my client had committed an arson by gasoline. And I think the one thing I've learned as an attorney is whether it's as a prosecutor, defense attorney, or plaintiff's attorney in an insurance bad faith case, there's a couple things that you really have to do. Number one, preparation. And preparation requires investigation. And in arson cases, investigation requires expert analysis. And it's only after all of that work has been done that a prosecutor, defense attorney, or civil litigator can come to any form of strategy. And why is this important? Well, there's three words that come out of a Ninth Circuit opinion, Frierson v. Woodford at 463 Fed Third 982-992, where the judge said, quote, strategy presupposes investigation. The court goes on to say, citing Sanderson, counsel can hardly be said to have made a strategic choice when he has not yet obtained the facts on which such a decision could be made. Now, as we go through the briefs in this case, we notice that a lot of the emphasis, I believe, by the U.S. Attorney's Office is on the second trial. It's sort of ignoring what happened in this first trial, where the jury hung 11 to 1 for acquittal. And I think that's important, because when the court starts weighing things, the court says, you know, what's the probability that but for this being done, there might have been a different decision? Well, I think what's really important in analyzing the case here are the facts and the testimony of Peter Robinson. Peter Robinson was the court-appointed trial counsel in this case, both in the first trial and the second trial. And when we go to the excerpts of record on page 1423, beginning lines 7 through 13, the question-answer goes as follows. Question. And is there a reason why you did not consult with an arson expert? Answer. Well, yes. Basically, my review of the evidence at the time, I felt that there was no question as to whether or not this was an arson from what I saw. So I didn't devote any effort towards consulting with an expert or going doing any work on that aspect of the case. Then on line 23 of the same page, question. Did you develop any knowledge or skills that may, from those previous cases, that would allow you to come to a determination with regard to the cause or origin of this fire in this case? Answer. No, nothing with respect to arson in particular. Can I ask you how this would have played out at trial? This really goes to the prejudice issue if, you know, we had the first trial and it was an arson trial with a hung jury. Now you have a second trial and the defense counsel says, you know, it's not arson, despite what the ATF said, despite Venable and Glover pleading guilty, despite what Ms. Beardsley says on the tape, it's not an arson. So that's where I'm having some trouble and would appreciate your comment on this, on the prejudice prong, given these facts that would have been quite evident in the second trial. I understand that, Your Honor. And when we get to, excuse me, Chief Richard Bostick's testimony at the 2255 hearing, you begin seeing what the prejudice really is. The evidence is clear at the hearing and it's uncontradicted by the U.S. Attorney's Office at the hearing that the fire was not arson, that the stories as told by Mr. Venable couldn't happen. For example, I get to the page and line numbers, but at one point Mr. Venable says in one tape, well, I drilled a hole in the wall and I poured five gallons of gas in. Now this is a three-inch hole. Five gallons of gas in a three-inch hole in a cinder block building. If you know anything about cinder block construction, there are holes in the cinder block, which says, oh good, you could have poured it in there. But those holes are filled with concrete. That's what creates the strength in the building. So the possibility of that occurring is not credible. And Chief Richard Bostick, the former fire chief of the city of Riverside, says that's not credible. It couldn't possibly have happened. And then Mr. Venable chooses to change his story and he says, well, he says, you know, I poured it in what we might better call a soil pipe. The soil pipe is the pipe coming out of a toilet that goes eventually to a sewer or septic line. The trouble is with his story, effluent runs downhill. For him to do what he said, he had to pour it uphill. As Chief Bostick says, impossible. Impossible going uphill, number one. Number two, impossible getting past the P-trap. Impossible, impossible, impossible. Chief Bostick continually says this could not have been an arson. Chief Bostick then says in his testimony, it's clearly a short circuit. Now, the short circuit in the breaker box, which is in the office, causes some copper wire to melt, falls down on some construction debris, and begins a fire. Now, when you try arson cases, you know that you start looking for things. And as Chief Bostick describes, you look to the bottom of a V, because that's where the fire begins. And if you can just visualize a fire, it goes up and it spreads out. And so he's able to track the copper droppings. And yes, he's looking at photographs. And yes, this is criticized as having never been at the fire scene. But the only arson investigator ever at that fire scene was Chief Lima of the Fort Bragg Fire  Now, that's a testimony presented during trial, because Mr. Robinson stipulates it's arson. Mr. Robinson conducts no investigation by his own admission. Mr. James, do you agree that in deciding whether or not this was ineffective assistance, we need to focus on the second trial? No. No. Because I think you have to an invest to me, an investigation, a preparation for trial begins the moment a client comes into the office and hires me. When I was district attorney, it happened as soon as the police officer or California Division of Forestry officer, in many arson cases I was involved in, comes in with a report. We sit down and we go through the report. Because occasionally in my career, I've had to retry a case. And I found, at least in my own experience in retrying a case, I don't look at it the same way I do. Let me ask the question differently. In deciding whether or not counsel was ineffective at the second trial, shouldn't we take into account the fact that his strategy was successful in the first trial in preventing a conviction? Well, Your Honor, I think that's obviously one way we can look at it. But I think the fact of the matter is, there was no strategy because he didn't know it wasn't arson. He didn't go learn it wasn't arson. Had he learned it wasn't arson and followed the strategy of stipulating it's arson, that's one thing. But he didn't prepare. He did not prepare to present his case. And it's okay for a case to come down where you have a no arson defense and you have somebody saying, I plead guilty to arson because, by the way, I'm getting all these nice deals over on the other side here on potential sentences in other cases. So it doesn't hurt me to plead guilty to the arson because it's not going to enhance my punishment. As I understand his testimony at the 2255 hearing, he said that he relied on three or four factors. One is that several investigators had concluded that the fire was arson. The second was that two co-defendants had confessed to the arson. The third was that his client had said from the outset repeatedly that it was arson. And a fourth factor it would seem you need to consider is that the stipulation to arson had already been successful in one trial. Given all of those factors, plus the strong presumption that he did not provide ineffective assistance, do you think that the expert's opinion you provided overcomes the presumption? I do. Your Honor, when he testified at the 2255 hearing and he said all the experts said, there was no expert that said it was arson originally. Sometime after the event, there's a Mr. — I may slot in the pronunciation of the word, his name, but G-U-I-Z-N-E-S-S Ginsness. And I believe Mr. Ginsness is an investigator for an insurance company. He comes into the fire scene several days after the fire occurs. His first conclusion, as indicated by Chief Bostig at his testimony at the 2255 hearing, is that it was an electrical fire. It's only after he goes out and gets this machine called a sniffer, which was in its early days of use, that he changes his mind. Yet, as Chief Bostig testifies, when he uses a snifter, he uses it all wrong. The Chief makes reference to specific photographs about how they abuse the sniffer, how they put it underneath objects when they're not supposed to. He testifies that wall-to-wall carpet is made out of petroleum products, and so the sniffer is going to say there's petroleum products. It doesn't say gasoline. It says petroleum products. And so we go all around that as being uncredible testimony by the insurance adjuster, whose experience — we don't know what it is as an arson investigator, but we do know Chief Bostig is a very experienced arson investigator prior to becoming chief of police in the city of Riverside. And we do know that by his testimony, he says it was an electrical conduit fire. Any simple effort to learn something about arson, you would know that — how fire burns. You would know that right now, if I threw a quart of gasoline on this floor and threw a match on it, there would be an explosion. If I threw five gallons of gasoline, and there's no gasoline ever found in the facility, on the carpet, according to Chief Bostig, it would have blown up the whole place. So there's no experts, as Mr. Robinson says. There is Chief Lima, who says it is an electrical fire. It's caused by an overheating sump pump, a sump pump which pumps the sewer from the toilet uphill to a sewer line. And so I think that actually when Mr. Robinson said what he said in his testimony, he misspoke. And I'd like to quote one excerpt of Mr. Robinson's testimony. Excerpt of Record, Volume 8, page 1477, line 25. Question. Did you have prior to either one of these trials evidence that the fire was not in fact an arson? Answer, yes. Question, what was that? Answer, that basic, that initially when the Fort Bragg Police Fire Department, excuse me, I said, yes, the Police Fire Department had gone to the scene, they determined that it was a fire of electrical origin. Question, and did you have evidence that after that initial determination that all other experts had concluded that it in fact was an arson? Answer, that is to the best of my recollection, yes. Question, and when other than the initial conclusion of Chief Lehman, did you have any other evidence that the fire was not an arson? Answer, no. Can I ask you, moving apart from experts and going to this, I guess what I'll call the Barry Jerry transcript of the conversation, and Jerry is your client, correct? Yes. Okay. And Barry says toward the end of this, wow, well, that's too bad. I had to burn the place and now you can't even pay me. So what, a year or less do you think, or what? Jerry says, I don't know. Is there any way? I said, well, I have no idea. It's not going to be anything before a year, and that's one of several parts of the conversation where he's talking about burning it down and not getting his money. That's where I'm focused to a degree on whether there's prejudice given this conversation plus other evidence about the arson from Barry and the other guy. So what do we do with this conversation? I've actually thought about that a great deal, too, Your Honor. In my experience as a prosecutor, and let's just for the purposes of discussion call this an admission on the part of my client. Before an admission is admittable into evidence, you have to establish the corpus of the crime to wit the arson. There is an arson that was committed. Well, no. Actually a statement by a party is admissible whether or not it doesn't need to be an admission  A statement by a party? Under the circumstances of the case, Your Honor, Mr. Venable had a relationship with my client, which was as a former employee. Mr. Venable was attempting to have a relationship with my client's daughter at the time. Mr. Venable had purchased, I believe, a car from my client at a time significantly subsequent to the fire. My client was, and I think there's accusations you find in the transcript of being blackmailed by Mr. Venable, because Mr. Venable was going to go to law enforcement, as she believed and is in her testimony at the 2255 hearing. And she was afraid because of her bad relationship with Anheuser-Busch that they would accuse her of arson. And I would say one other thing, which this isn't part of the record, Your Honor. I've known Mrs. Beardsley since 1984. I represented her in a case in 1984 when Anheuser-Busch, when she was a franchisee and I know the problems she was having five years before this event ever took place. This is a very difficult situation that she's had to go through. And it still, for her, is an extremely difficult one because of her firm belief of her own innocence. Mr. Venable is, I think, highly questionable, no matter what he says. Did you want to save time for rebuttal? It doesn't look like I have very much time to save, Your Honor. I would just submit the matter at this point and thank the Court for its time. Thank you. Good morning. May it please the Court. I'm Douglas Wilson on behalf of the United States. In this case, the defendant had the burden to show that the strategic decision made by Peter Robinson prior to either trial and certainly before the second trial amounted to constitutionally ineffective assistance of counsel. And I don't think he's carried that burden. Before the first trial, that is, before either trial, Mr. Robinson knew the following facts. He knew that Les Pierce, a Fort Bragg Fire Department investigator, had found gasoline in the warehouse with the highest concentrations of the gasoline in the office. So it's simply not true that no gasoline was found in the office. Brad Cooper, and that's at ER-884, Brad Cooper, an ATF forensic chemist, had also found gasoline in seven carpet samples that had been submitted to him for analysis, and those carpet samples were also taken from the office. That's at ER-885. Jared Taylor, an ATF explosives enforcement officer, had determined that the fire started in the wall between the office area and the bathroom, and his opinion was that the fire originated in the bathroom and office wall and was caused by gasoline poured into the structure and ignited. That's at ER-885 and 886. And finally, Earl Gisness, the insurance investigator mentioned by opposing counsel, had also concluded that the fire was incendiary in origin. And it's noteworthy that when he first visited the building, which was shortly after the fire, he detected the odor of gasoline, and that's at ER-644. In addition to those expert analysis, Mr. Robinson also knew that Venable had repeatedly claimed to have started the fire in the manner determined by the arson investigators. In his initial interview with ATF, he said that he put five gallons of gas through the plumbing hole, through the plumbing in the wall, where the plumbing goes through the bricks, he said. He said he pulled the plumbing apart and funneled in about five gallons of gas. Two days later, he said essentially the same thing, although, as counsel noted, he did use the word drilled. He said he had drilled a hole in the wall. His testimony at the first trial was also to the same effect, that he poured gasoline through a funnel, through a hole in the bricks, where the plumbing came out of the wall. And he repeated that testimony at the second trial. Paul Glover, his accomplice, also testified at the second trial that Venable put a tube through the wall and poured the gas in. And both defendants, excuse me, both Venable and Glover testified that when Venable lit the gasoline, a shot of flame shot out three feet, so there was an explosion when they lit the fire. Their testimony and the testimony of the fire investigators was corroborated by the fact that Glover and Venable received a traffic ticket in Willits, California, which is not that far from Fort Bragg, about two hours after the first fire department people responded to the scene. Mr. Pierce stated that he responded at 1254, and that's in his declaration at ER 884, and the, I'm sorry, at 879, and the ticket was issued at 2.58 a.m. So there was about a two-hour difference between the time the fire department arrived and the time that Glover and Venable got their traffic ticket. Venable was also able to draw a, make a rough drawing of the inside of the warehouse, even though he had never been there. In addition, there are Beardsley statements to investigators and to Mr. Venable. Beardsley said on 121289, two days after the fire, to Pierce, who was a Fort Bragg fire investigator, she disputed the conclusion that the fire was electrical and said, according to Pierce, that the fire was not electrical and that the plumbing on the outside of the south wall had been disconnected, and she believed the fire started at that point. She, quote, insisted the fire was arson, end quote. That's at ER 881. I guess, you know, Mr. James' primary point, and one that has a huge amount of logic behind it, is you have an arson case, you get an arson expert. I mean, why isn't, at a minimum, why isn't that, under the first prong, ineffective assistance? Well, Your Honor, I think that the case law says that you don't have to conduct investigation when there are no facts to support it or when it's a reasonable strategic decision not to conduct the investigation. And here, I think, as Mr. Robinson testified, it was a reasonable strategic decision. He had this overwhelming evidence that I've been going through that the fire was an arson, that it was, that two people pleaded guilty to it and pleaded guilty just starting it in the way that the investigator's determinants started. And on the other side, he had the tentative conclusion of a Fort Bragg fire department officer who arrived at the scene at 1 in the morning the night of the fire and made an initial assessment based on his perception while he was putting out the fire that it might have been electrical in origin or that it was electrical in origin. So balancing the two things, the question is whether Mr. Robinson made a reasonable decision. And we would submit that he's got an expert or she has an expert now. And the first person on the scene thought it was not arson, right? He thought it was electrical. He said that he thought his initial impression was that it was electrical in origin. But so if you have that, and then you have an expert report, you've got something at least you can go after Venable on, which he has his own problems in terms of his self-interest here. Well, and Mr. Robinson did go after Venable quite aggressively and cross-examined him at trial. But I think the point in response to the Court's point, the expert analysis had found gasoline all over the inside of the warehouse, and Venable and Glover said they started with gasoline. And I think that reasonably eliminated any doubt in Mr. Robinson's mind that the fire was anything but an arson started by gasoline. Every expert said it was gasoline. Excuse me, Your Honor. Kennedy. What sentences did Venable and Glover receive? They both received probation, Your Honor. Doesn't that call into question somewhat the credibility of their arson claim? I mean, clearly they were going to receive a benefit for their testimony if they supported the State's case. Well, they were sentenced after the second trial, so they did not know what sentence they would receive at that time. And they were both extensively cross-examined about the benefits that they hoped to receive in return for their testimony. Mr. Robinson's cross-examination of Venable was many pages long and explored the inconsistencies in his testimony as well as the many benefits he hoped to receive. Neither of these people, I candidly admit, was a model citizen, and both of them had extensive records. And those were thoroughly examined in cross-examination at trial. In your brief, you focused heavily on the fact that this was a second trial and that there had been a successful defense in the first trial. What do you say in response to Mr. James' point that we need to look at the entire representation from before the first trial and ask whether it was reasonable at the outset for Mr. Robinson not to retain an investigator? Well, I have two answers, Your Honor. The first is that the district court focused on the second trial. And I think that the key part of the district court's analysis is that a lot of what the defendant had tried out some of the strategies that he would have to have worked harder on at the first trial. He had tried to impeach Venable. He had tried to show that Venable was lying. He had tried to show that Ms. Beardsley's statements during the recorded conversations with Venable were or had some innocent or some explanation that did not show that she was implicit and complicit in the fire, and had failed to do so. Or, excuse me, he had been successful in doing so, and to change that would have caused problems in the second trial. But I think the more important answer to Your Honor's question is that all of the evidence that I've tried to outline here this morning was in Mr. Robinson's possession before the first trial. So even if the Court wants to look at what Robinson knew before the first trial, the evidence is still overwhelming and more than amply supports his reasonable strategic decision to forego an investigation as to whether the fire was arson. The second trial is really just icing on the cake and shows that, as the district court said, decisions have consequences, and those consequences would have been magnified if he had tried to switch strategies after the first trial and show that the fire was not an arson. The only ---- And there's a certain irony in that, if the investigation was faulty at the outset and then you get lucky and get a hung jury, it kind of cooks your goose for your ineffective assistance of counsel claim. I mean, that really has a juxtaposition that doesn't really kind of sit right in terms of fairness. Would you comment on that? Well, I think most of what we're presenting to the Court and most of what the district court relied on is evidence in Robinson's possession before the first trial. So there really isn't any unfairness in saying that the decision he made was a reasonable decision, because it was reasonable before the first trial and it became even more reasonable in light of the results of the first trial and his experience at the first trial. So, you know, the government is perfectly willing to hang its hat on what Robinson knew before the first trial if the Court has some concerns about fairness, because most of the evidences to the fire, including the expert evidence, Venable's and Glover's testimony, and Beardsley's own statements, was in existence before the first trial. And it was really only the ---- I think what the second trial does is show that shifting tactics and trying something else would have been dangerous, because as the district court found, the strategy employed by Mr. Robinson at the first trial was somewhat successful. It convinced some jurors, and I actually don't know whether it was 11-to-1, but it certainly convinced some jurors that there was a reasonable doubt as to Beardsley's guilt. And I think most defense lawyers would be hesitant to switch horses and try a new strategy after getting a hung jury at the first trial. That suggests that the strategy they undertook had some success. I don't know why it's impossible to ---- it's impossible for us to know, and we can only speculate, but I think the evidence does show that Robinson made a reasonable decision before the first trial and that the first trial confirmed the reasonableness of that. I went through most of the evidence that Robinson had before the first trial. Now, the only thing I would like to note is that, as the Court pointed out, the transcripts of the conversations between Beardsley and Venable are quite inculpatory of Beardsley. Read as a whole, I think they show that Beardsley knew that Venable had started a fire on her behalf or had started a fire for her, and although there aren't a lot of explicit comments where she says that, the tone overall is that ---- reflects that understanding. And she does on a couple of occasions say, as the Court pointed out, that she didn't get her money's worth. She says the warehouse wasn't destroyed. She complains that Mr. Venable involved Mr. Glover in the arson without her knowledge. She says she wouldn't have done it if she'd known Glover was involved. So there are quite a few statements in that recorded conversation that also contribute to Robinson's belief and understanding that a no-arson defense wouldn't have worked. Counsel didn't have any ---- an opportunity to address any of the other arguments raised in their brief. I'm happy to answer any questions that the Court has on those issues. I have one last question, Mr. Wilson. The three categories of evidence that you have relied on to say the conduct was reasonable were the conclusions of certain experts that it was arson. Number one, the testimony of Glover and Venable, number two. And number three, the fact that Ms. Beardsley asserted from the outset that it was arson. As to that third point, isn't the easy answer to that, she's not an expert? She might have thought it was arson, but that is irrelevant on the question of whether or not it really is, because she's no expert. And we're not submitting that she was, Your Honor. Our ---- what we think those statements show is that she knew that it was arson, that when she arrived at the scene for the first time a couple of days after the arson, she went right to the place where the fire was started and said, I think this was an arson and I think it started right here. And it's that ---- the statements show that knowledge, not that they show that she has scientifically informed ability to determine whether something's an arson or not. It goes to her knowledge, not necessarily to any kind of expert conclusion that the arson ---- the fire was an arson. And there is, as I say, a fourth category, which is her statements that she made debatable during the recorded conversations. Thank you. If the Court has no further questions, thank you. Thank you. Again, if you want to add anything or leave it as submitted. Just two very brief things, Your Honor. Thank you. Number one, there was an attempt to get the three tapes of the interviews. A forensic expert examined the tapes of the interviews with my client. And this is all set out in the hearing. And he found that there were alterations, there were stops in the tape. So we don't know what was or was not ever in the tape in its entirety. Mr. Robinson didn't follow up. He didn't get what he needed to do to finish the examination. That's just going into another field where Mr. Robinson totally failed his counsel. Counsel keeps referring to gasoline. There's nothing in the record that shows gasoline. Nothing. I challenge him to find it. The word gasoline. Petroleum products, yes. I'd just like to read one question and answer part from Chief Bostig. In this regard, that thing called the sniffer. And this begins Excerpts of Record, Volume 7, page 1329, beginning line 22. Question, and quote, are those samples all taken from underneath the rug that is petroleum-based? Answer, yes. And they indicated on each one of them, four feet from the south wall, for instance, from this wall, 1,000 parts per million reading. Question, beginning line 10 on page 1330, continuing it. If there were that many parts per million vapors on that rug, would you expect it to burn? Answer, it would have exploded. To be a better term for that, it would have been a rapid oxidation accompanied by light and heat, which is an explosion. It wasn't gasoline. The burning that occurred on the carpet was because something dropped out of the mezzanine, when a hole burned through the mezzanine. And it burned like a three-foot little spot in oil-based indoor-outdoor carpet. I mean, if you've ever dropped a match on your own, and I have. That's why I say if you ever have, on carpet like that, it'll burn a hole there. I mean, there's no question. That doesn't gasoline. Gasoline is an explosive. And when it goes, it goes. And if you had five gallons in there, it would have blown the roof off the building. Thank you for your time, Your Honor. Thank you. I thank both counsel for your arguments this morning. The case of United States v. Beardsley is submitted and we're adjourned for the morning.
judges: Campbell, Hall, McKeown